1  ADAM J. ZAPALA (SBN 245748)
2  azapala@cpmlegal.com
   TAMARAH P. PREVOST (SBN 313422)
3  tprevost@cpmlegal.com
   **COTCHETT, PITRE & McCARTHY, LLP**
4  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
5  Burlingame, CA  94010
   Telephone:  (650) 697-6000
6  Facsimile:   (650) 697-0577

7  *Attorneys for Plaintiff*

8

9

10

11                    **IN THE UNITED STATES DISTRICT COURT**

12               **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13  JOANNE (NONI) FERRARI,                    | Case No. _____

14                    Plaintiff                | **COMPLAINT FOR:**

15           v.                                | 1) **Unlawful Retaliation – Federal**
                                                  **False Claims Act (31 U.S.C. §**
16  INTERNAL MEDICINE ASSOCIATES OF              **3730(h))**
    SAN MATEO, A MEDICAL GROUP, INC.,         | 2) **Unlawful Retaliation – California**
17  BEATTY RAMSAY, M.D., TIMOTHY                 **False Claims Act (Gov. Code §**
    OFFENSEND, M.D., HEMA SHAH, M.D.,           **12653)**
18  HOA LE, M.D., ANURADHA REDDY, M.D.,       | 3) **Unlawful Discrimination (Gov.**
    and JUDY MADRIGAL & ASSOCIATES,             **Code § 12940(a))**
19  INC., d/b/a JMA HUMAN RESOURCES           | 4) **Unlawful Retaliation (Gov. Code**
    MANAGEMENT,                                 **§ 12940(h))**
20                                             | 5) **Unlawful Retaliation (Lab. Code**
                    Defendants.                  **§ 1102.5)**
21                                             | 6) **Wrongful Termination in**
                                                  **Violation of Public Policy**
22

23                                             | **JURY TRIAL DEMANDED**

24

25

26

27

28

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   JURISDICTION AND VENUE ......................................................................... 2

III.  THE PARTIES ................................................................................................... 2

    A.    Plaintiff ................................................................................................... 2

    B.    Defendants .............................................................................................. 2

    C.    Other Defendants .................................................................................... 3

    D.    Agency And Concert Of Action ............................................................. 4

IV.   FACTUAL BACKGROUND ............................................................................. 4

    A.    Mrs. Ferrari Was Convinced to Manage IMA's Office, And Thrived In Her Seventeen Years Of Employment ........................................................... 4

    B.    Mrs. Ferrari Received Regular Commendations For Excellent Performance ........ 5

    C.    Mrs. Ferrari Witnesses IMA's Unlawful Practices and Engages in Whistleblowing Conduct ........................................................................ 6

        1.    Mrs. Ferrari Witnesses Several Illegal and Unethical Acts on Behalf of IMA Doctors ........................................................................ 6

        2.    Mrs. Ferrari Reported the Illegal and Unethical Conduct She Witnessed ........................................................................................ 8

    D.    Defendants Discriminate Against Ms. Ferrari On the Basis Of Her Age ............... 9

    E.    Defendants Take Adverse Employment Actions Against Mrs. Ferrari ................. 11

    F.    Mrs. Ferrari Engages In "Protected Activity" Under FEHA By Opposing Defendants' Age Discrimination ........................................................... 14

    G.    Direct and Circumstantial Evidence Show That Mrs. Ferrari's Termination Was Pretextual ....................................................................................... 14

    H.    Conditions Precedent to Filing Action .................................................. 15

V.    CAUSES OF ACTION ..................................................................................... 16

FIRST CAUSE OF ACTION
(Unlawful Retaliation Under the Federal False Claims Act 31 U.S.C. § 3730(h))
(Against IMA, Dr. Beatty Ramsay, M.D., Dr. Timothy Offensend, M.D.,
Dr. Hema Shah, M.D., Dr. Hoa Le, M.D. and Dr. Anuradha Reddy, M.D.) .................... 16

SECOND CAUSE OF ACTION
(Unlawful Retaliation for Whistleblowing Under the
California False Claims Act, Gov. Code, § 12653)
(Against IMA, Dr. Beatty Ramsay, M.D., Dr. Timothy Offensend, M.D.,
Dr. Hema Shah, M.D., Dr. Hoa Le, M.D. and Dr. Anuradha Reddy, M.D.)) ...................16

THIRD CAUSE OF ACTION
(Unlawful Discrimination on the Basis of Age
in Violation of Cal. Gov. Code § 12940(a))
(Against All Defendants) ........................................................................................18

FOURTH CAUSE OF ACTION
(Unlawful Retaliation for Engaging in Protected Activity
In Violation of Cal. Gov. Code § 12940(h))
(Against All Defendants) ........................................................................................18

FIFTH CAUSE OF ACTION
(Unlawful Retaliation for Whistleblowing
In Violation of Cal. Lab. Code § 1102.5)
(Against All Defendants) ........................................................................................19

SIXTH CAUSE OF ACTION
(Wrongful Termination in Violation of Public Policy)
(Against All Defendants) ........................................................................................20

PRAYER FOR RELIEF ..............................................................................................21

REQUEST FOR JURY TRIAL ....................................................................................22

Plaintiff Noni Ferrari ("Mrs. Ferrari") by her undersigned counsel, hereby complains against Defendants Internal Medicine Associates of San Mateo, a Medical Group, Inc. ("IMA" or "the Practice") Dr. Beatty Ramsay, M.D., Dr. Timothy Offensend, M.D., Dr. Hema Shah, M.D., Dr. Hoa Le, M.D.,  Dr. Anuradha Reddy, M.D., and Judy Madrigal & Associates, Inc., d/b/a JMA Human Resources Management ("JMA," collectively, "Defendants") and Does 1-20, and alleges as follows:

## I.   INTRODUCTION

1.     Mrs. Ferrari devoted 17 years of her working life to Internal Medicine Associates, a medical practice in San Mateo.  She began handling medical billing, and was rewarded with two promotions, ultimately holding the Office Manager title.  Mrs. Ferrari's efforts towards organizing the office, supervising staff, and establishing compliance were instrumental to maintaining IMA's smooth office operations.  Throughout her tenure at IMA, Mrs. Ferrari was recognized as an excellent employee, receiving promotions and positive performance evaluations.

2.     Mrs. Ferrari, at age 59, enjoyed serving IMA's doctors and patients and planned to do so until she retired.  But she also took seriously the responsibilities she had been given for compliance with various medical guidelines and laws, such as under Medicare and Medi-Cal— two government-sponsored medical programs.  Upon learning of several IMA doctors' widespread billing fraud in relation to these government-sponsored medical programs, she relayed her concerns to the Practice's senior managing doctors and implored them to change their billing practices.  But the fraudulent conduct was highly profitable for IMA, so rather than correct the fraud, Defendants terminated Mrs. Ferrari.  As alleged herein, Mrs. Ferrari was discharged because she was a whistleblower: she was one of the only employees who had personal knowledge of the widespread nature of Defendants' practices, and how far back in time they went.   Uncoincidentally, Mrs. Ferrari was also IMA's oldest employee, and Defendants' termination of her was also substantially motivated by her age.

3.     In her entire employment tenure at IMA, Mrs. Ferrari never received anything but positive feedback.  There is simply no other plausible explanation for her termination other than the unlawful reasons as set forth herein.

COMPLAINT                                                                                    1

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(h)(2), which allows for jurisdiction to be conferred on this Court for actions brought under 31 U.S.C. § 3730(h).

5.      Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), as Defendants can be found, and transact business in San Mateo, California, located in this district.

## III. THE PARTIES

### A.      Plaintiff

6.      Plaintiff Joanne ("Noni") Ferrari is a natural person who is, and at all times mentioned in this complaint lives in San Mateo County, in the State of California.

7.      Mrs. Ferrari has lived in San Mateo County for over three decades, for 33 years in San Carlos, and in the same home for 27 years.  She purchased her home in 1986 with her husband Tom after the two were married, and has two children and two grandchildren, aged three and a half and nine months respectively, who also live close to her.

### B.      Defendants

8.      Plaintiff is informed and believes, and thereon alleges, that Defendant IMA is, and at all times relevant in this complaint was, a California medical practice with its principal place of business and headquarters in San Mateo, California.

9.      Plaintiff is informed and believes, and thereon alleges, that Defendant JMA is, and at all times relevant in this complaint was, a San Mateo, California domestic stock corporation registered to do business in California with its principal place of business and headquarters in San Mateo, California.  JMA touts itself as providing "comprehensive, personalized HR" functions to small and medium sized businesses, such as payroll, benefits, recruiting, and compliance. On information and belief, IMA hired JMA in or about 2005 to fulfill its human resources needs. Defendant JMA is a joint employer of Mrs. Ferrari, along with Defendant IMA.

10.      Plaintiff is informed and believes, and thereon alleges, that Defendants Dr. Beatty Ramsay, M.D., Dr. Timothy Offensend, M.D., Dr. Hema Shah, M.D., Dr. Hoa Le, M.D., and Dr.

Anuradha Reddy, M.D. are currently practicing medicine at IMA.  At all times relevant in this complaint, these individuals resided in San Mateo County, California.  At all times relevant in this complaint, these individuals were serving as agents, representatives, employees, and/or joint venturers with IMA and/or JMA.

11.    Drs. Offensend, Ramsay, Shah, and Le are also owners of the practice and hold executive roles: Dr. Shah is the Chief Financial Officer, Dr. Le is the Chief Executive Officer, and Drs. Ramsay and Offensend are both Secretaries.

12.    JMA and IMA both had the right to exercise certain powers of control over Mrs. Ferrari and were her joint employers.

13.    IMA was Mrs. Ferrari's employer.  Mrs. Ferrari throughout her employment was under the control of IMA.  Upon Mrs. Ferrari's hiring, until she was terminated, IMA controlled Mrs. Ferrari's wages, hours, and working conditions.  IMA supervised the performance of Mrs. Ferrari's day-to-day employment duties and exercised the same control over all employees working at IMA with Mrs. Ferrari.  IMA evaluated Mrs. Ferrari's performance and issued her performance reviews, and held the authority to discipline, hire and fire her, and to alter the terms and conditions of her employment.

14.    JMA was also Mrs. Ferrari's employer.  For every pay period beginning when JMA was retained by IMA, JMA issued each of Mrs. Ferrari's paychecks, and controlled the payroll and maintenance of employee records for IMA.  JMA held the human resources function for all employees working at IMA.  JMA also had control over the terms and conditions of Mrs. Ferrari's employment, either as an agent of, or independent from IMA, and communicated the adverse action taken against Mrs. Ferrari to her.  JMA with IMA jointly held the power to alter the terms and conditions of Mrs. Ferrari's employment, which they did.

**C.    Other Defendants**

15.    The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants DOES 1 through DOES 20, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names pursuant to Code of Civil Procedure § 474; Plaintiff further alleges that each of said fictitious Defendants is in some manner responsible

COMPLAINT                                                                 3

1   for the acts and occurrences hereinafter set forth.  Plaintiff will amend this Complaint to show

2   their true names and capacities when the same are ascertained, as well as the manner in which

3   each fictitious Defendant is responsible.

4   **D.    Agency And Concert Of Action**

5        16.    At all times herein mentioned, Defendants, and each of them, hereinabove, were

6   the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint

7   venturers of each of the other Defendants named herein and were at all times operating and acting

8   within the purpose and scope of said agency, service, employment, partnership, enterprise,

9   conspiracy, and/or joint venture, and each Defendant has ratified and approved the acts of each of

10  the remaining Defendants.  Each of the Defendants aided and abetted, encouraged, and rendered

11  substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as alleged

12  herein.  In taking action to aid and abet and substantially assist the commission of these wrongful

13  acts and other wrongdoings complained of, as alleged herein, each of the Defendants acted with

14  an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would

15  substantially assist the accomplishment of the wrongful conduct, wrongful goals, and

16  wrongdoing.

17                          **IV. FACTUAL BACKGROUND**

18  **A.    Mrs. Ferrari Was Convinced to Manage IMA's Office, And Thrived In Her**
19        **Seventeen Years Of Employment**

20        17.    In or about October 2001, Mrs. Ferrari joined IMA for the exclusive purpose of

21  handling IMA's medical billing.  Initially, the schedule Mrs. Ferrari was expected to, and did

22  keep, was Monday to Friday, five days a week, from 9:00am - 3:00pm.  At that time, Dr. Beatty

23  Ramsay was IMA's Managing Physician.

24        18.    Less than a year into her employment, Dr. Ramsay recognized Mrs. Ferrari's talent

25  and meticulous attention to detail, and promoted her to a Billing Manager employee in May 2002.

26  IMA paid Mrs. Ferrari monthly performance bonuses for her excellent work, which was

27  documented in several positive performance reviews.  Dr. Ramsay regularly asked for Mrs.

28  Ferrari's advice on management questions, such as hiring and personnel matters.

19.     Due in part to her high-level work, Dr. Ramsay repeatedly asked Mrs. Ferrari to take on the role of Office Manager for the entire Practice.  At first she resisted, as the role required overseeing 13 employees and five doctors, and was significantly more responsibility than her prior position.

20.     But Dr. Ramsay persevered, and in 2003, approximately two years into her employment, Mrs. Ferrari accepted the Office Manager role at IMA.

21.     In her new role, Mrs. Ferrari oversaw office logistics, trained and supervised office staff, and maintained compliance with proper medical billing and reporting to Medicare, Medi-Cal, and third-party insurers to satisfy various disclosure requirements.  She was charged with handling all of the doctors' individual medical Board compliance and oversaw correspondence for hospital and insurance contracts.  Her role was critical to securing revenue for the Practice.

22.     IMA and Mrs. Ferrari agreed when she accepted the Office Manager position in 2003 that her work schedule would run 8:30am to 4:00pm, Monday through Friday, with every other Friday off.  Later, in approximately 2005, IMA and Mrs. Ferrari negotiated and agreed she would take every Friday off, but only conditioned on her declining the salary increase being offered at that time, which she did.  Mrs. Ferrari worked this same schedule, with five weeks of vacation time, and ten days of sick leave, for close to 14 years.

**B.      Mrs. Ferrari Received Regular Commendations For Excellent Performance**

23.     Mrs. Ferrari's performance was clearly satisfactory to IMA: she has received performance bonuses, pay increases, positive feedback and numerous commendations during her time at IMA.

24.     In fact, Mrs. Ferrari excelled in her profession right until the weeks and months before her termination.  In approximately 2018, the Practice chose to install a new billing software program called EPIC.  Mrs. Ferrari was responsible for facilitating the transition from IMA's then-current software, which housed in part the confidential and private health information of its patients, onto the EPIC system.  Customarily, transitions such as these can be burdensome and costly for medical practices due to the productivity time lost in the transition between software programs.

25.     Mrs. Ferrari worked with each staff member, and all the doctors, to ensure that the transition between software programs was as seamless as possible.  And she succeeded: IMA lost almost no revenue as a result of the switch.

26.     Mrs. Ferrari, right up to her termination, received accolades from the doctors and the staff she oversaw. In over 17 years of service, she has never received discipline for poor or unsatisfactory performance.

## C.     Mrs. Ferrari Witnesses IMA's Unlawful Practices and Engages in Whistleblowing Conduct

### 1.     Mrs. Ferrari Witnesses Several Illegal and Unethical Acts on Behalf of IMA Doctors

27.     During her time at IMA, Mrs. Ferrari observed several practices by physicians that appeared to violate the law and be unethical.

28.     Patients trust IMA's doctors to provide medically necessary, cost-effective, quality care and IMA exerts significant influence over both the services its patients receive, and the documentation describing those services.  Mrs. Ferrari's responsibility for ensuring the Practice was compliant with Medicare and Medi-Cal reporting guidelines led her to discover a number of errors and omissions in patient files.

29.     IMA contracted with Medicare to treat hundreds of patients over the course of Mrs. Ferrari's employment.  IMA also accepted patients to received Medi-Cal funds.  Mrs. Ferrari witnessed a widespread practice of overbilling both Medicare and Medi-Cal, and other private insurance carriers, each of which carry strict requirements governing claims submitted for reimbursement, and documenting patient records.

30.     For example, per Medicare guidelines, each minute spent treating patients must be appropriately coded in each bill submitted to Medicare, and properly documented in that patient's clinical file.  Billing either Medicare, Medi-Cal, or third-party insurance providers for medically unnecessary services, for services not provided, or separately for services already included in a global fee, are improper and otherwise illegal, in violation of these agencies' strict regulations.

31.     Mrs. Ferrari regularly witnessed IMA's doctors billing Medicare for treatments that were not actually performed per Medicare, Medi-Cal, and insurance provider billing

guidelines. Bills submitted to Medicare were incorrectly documented in patients' records, and time spent by doctors performing services under certain billing CPT[1] codes did not match bills submitted to Medicare. Sometimes, IMA billed Medicare and Medi-Cal for services never rendered at all.

32. For example, IMA would have patients complete pre-physical questionnaire forms, meant to screen for depression. IMA would then bill Medicare for time spent reviewing those forms with patients but would never actually conduct such a review. IMA doctors would sign off on these charges as though these services were performed for a particular amount of time, when they were not, or were performed for less time.

33. IMA doctors also failed to properly maintain patient records, in violation of Medicare guidelines, which mandate that physicians must properly record in patient charts the particular services they have provided, and the time spent providing those services, if they are also billing Medicare for it.

34. For example, some of IMA's patients were also being cared for by nurses who travel to those patients' homes. Nurses making such home visits would provide certification forms to IMA doctors accounting for the services provided and time spent. IMA doctors would then approve and sign-off on these forms, and bills would be submitted to Medicare corresponding to the time spent by the doctors to review and approve them. IMA doctors would bill Medicare under a CPT Code G0181, a Care Plan Oversight Charge, but would never enter the corresponding note pertaining to the charge into the patient's medical record, in violation of Medicare guidelines.

35. IMA also unnecessarily increased the number and frequency of patient visits to inflate their Medicare reimbursements. For example, Dr. Anuradha Reddy regularly required patients to return for another appointment after addressing their illnesses, for the sole purpose of

---

[1] A "CPT" code, or "Current Procedural Terminology," is a medical code used to report medical, surgical, and diagnostic procedures and services to entities such as health insurance companies and accreditation organizations. Medical practices use CPT codes to categorize the care provided to patients, and the codes are submitted to insurance and governmental agencies such as Medicare, for reimbursement.

billing another visit.  Or, after sending patients for lab work, Dr. Reddy forced them to make seriatim appointments to "review their lab results," or for simple prescriptions.  One patient visited Dr. Reddy seeking treatment for a common cold and fever, but rather than write a straightforward prescription that day, she made the patients return for another appointment so she could bill separately for those appointments.

36.     Dr. Reddy and other IMA doctors instructed staff to fraudulently schedule and bill patients receiving normal physicals for "office visits," which were reimbursable, rather than "physical exams," which were not.  She also directed staff to schedule separate appointments, inform the affected patients, and bill the paying entity separately, for each patient visit, in accordance with her demands.  Aside from extensive patient dissatisfaction, such practices did not adhere to Medicare and insurance regulatory coding guidelines.

37.     Other times, IMA doctors would add "extra charges" to patient records, and bill Medicare and/or Medical for these charges, without having conducted the care or services corresponding to the charges billed.

38.     IMA also accepted patients who received Medi-Cal coverage, and Medi-Cal guidelines mandate similarly strict reimbursement and recording rules as described above.  Mrs. Ferrari also observed IMA doctors employing the same and other unethical practices when seeking reimbursement from Medi-Cal for these patients, as described above.

**2.     Mrs. Ferrari Reported the Illegal and Unethical Conduct She Witnessed**

39.     Patients regularly complained to staff about the foregoing practices, sometimes because they were frustrated with being repeatedly forced to return for what appeared to be superfluous office visits, or because they noticed services included on their bills that were not provided to them.  In turn, the staff complained to Mrs. Ferrari.

40.     Mrs. Ferrari frequently reported these instances, beginning as early as 2015 to Dr.'s Ramsay, Shah, Offensend and Le, and later Managing Physician Dr. Hema Shah, all of whom had authority to correct these violations.

41.     Mrs. Ferrari explained to these doctors that the above billing practices were contrary to Medicare and Medi-Cal guidelines and needed to be remedied.  Mrs. Ferrari asked them to take corrective action to stop their practices or investigate further.

42.     And her complaints were frequent: Mrs. Ferrari reported them during weekly meetings, where the executive team doctors met to discuss various issues in the Practice with Mrs. Ferrari to include her feedback on these matters.

43.     IMA did not investigate the concerns Mrs. Ferrari raised, and took no action at all to remedy their illegal conduct.  Instead, IMA continued to employ doctors it knew were violating these regulations, which were very profitable for IMA at the federal and state government's expense.

44.     When Dr. Le and Dr. Shah learned of the violations involving Dr. Reddy, rather than remedy the problem, which resulted in significant additional revenue to their practice, Le and Shah instead instructed front desk staff to wall off their own patients from Dr. Reddy.  Staff were specifically told not to schedule Le or Shah's patients for appointments with Dr. Reddy, because they knew of her widespread over-billing, leading to great patient dissatisfaction.

45.     Mrs. Ferrari witnessed thousands of instances of false claims for reimbursement being submitted to the state and federal government, and insurance providers on behalf of IMA's patients. When she reported these violations to Dr.'s Ramsay, Shah, Offensend and Le, these doctors either rebuffed or otherwise ignored Mrs. Ferrari's reports.

46.     And when it became clear that Mrs. Ferrari was unrelenting in her resolve to achieve billing compliance, Defendants terminated her to stifle her opposition to their illegal billing practices and to end her whistleblowing.

**D.     Defendants Discriminate Against Ms. Ferrari On the Basis Of Her Age**

47.     In addition to the foregoing, Defendants discriminated against Mrs. Ferrari on the basis of her age.  Mrs. Ferrari was age 59 at the time of her termination, and on information and belief was the oldest employee on staff.

48.     In the final months before terminating her employment, Defendants regularly made discriminatory comments to Mrs. Ferrari about her age and expected retirement.

49.     For example, in November 2018, Dr. Shah and Mrs. Ferrari were working with a recently acquired software to store IMA's patient medical information. While training themselves on various aspects of that software, Dr. Shah said to Mrs. Ferrari, "doesn't this just make you want to retire?"  Surprised, Mrs. Ferrari replied that no, she had no plans to do so, and in fact she was enjoying the challenge of learning the new system.  She further explained her plan to work at least two or three more years before even considering retirement.  This exchange was made approximately a month before her termination.

50.     JMA also repeatedly made discriminatory age-related comments to Ms. Ferrari.  In December 2018, in retaliation for the reasons set forth herein, JMA forced Ms. Ferrari to either accept drastically less favorable employment conditions or resign.  *See* Section IV(E), *infra*. In making this "proposal," JMA Partner and Director of Human Resources, Kathy Kennady told Mrs. Ferrari that her brother, who was close in age to Mrs. Ferrari, worked for a company for many years and was terminated right before he wanted to retire.  His inability to find a job "due to his advanced age," caused him great hardship, cautioned Kennady, because he was not ready to stop working.  Kennady warned Mrs. Ferrari sharply: if she was not careful, this could happen to her as well.  Finding a new job at "her age," according to Kennady, would be extremely difficult and burdensome.

51.     In October 2018, Mrs. Ferrari shared off-hand with IMA that her husband Tom anticipated retiring in the near future.  On December 8, 2019, Tom did retire, a fact Defendants learned at that time.

52.     Tom's retirement caused a series of additional age-related comments directed to Mrs. Ferrari: IMA doctors repeatedly asked her when she would join her husband in retirement, pressing her for a response.  Mrs. Ferrari always responded she was not ready to retire and was enjoying her role in the Practice.   But Tom's retirement triggered Defendants' aggressive imposition of adverse employment actions on her.

53.     Within weeks of the above discussions and of her husband retiring, Defendants terminated and replaced her with a younger, far less experienced employee. Mrs. Ferrari's age was a substantial motivating factor behind Defendants' decision to terminate her.

**E.      Defendants Take Adverse Employment Actions Against Mrs. Ferrari**

54.      After Mrs. Ferrari's consistent complaints about IMA's improper billing practices, and as a result of her age, Defendants set forth on a joint campaign to force Mrs. Ferrari out of the Practice.

55.      Defendants' first efforts to oust Mrs. Ferrari began in or around November 2018, when they explained that her vacation time, which had accumulated to 509 hours, was excessive and needed to be reduced.[2]  This accumulation was unintentional on Mrs. Ferrari's part, but occurred because taking vacation days was a challenge due to her responsibilities and dedication to maintaining smooth office operations at the Practice.  She explained this to Defendants and agreed to reduce her hours in the manner preferred by the Practice.

56.      Defendants sought to partially pay Mrs. Ferrari to compensate her accumulated vacation time and asked her to take vacation in the near future to reduce her hourly balance, an arrangement that Mrs. Ferrari accepted.

57.      Then, in early December 2018, Drs. Le, Shah, and Ramsay called Mrs. Ferrari into a meeting with her and the other doctors.  In that meeting, the doctors asked her to increase the hours she would be expected to work, while keeping her rate of pay the same.  When asked why the doctors were proposing such a change, the doctors vaguely cited "business decisions" but gave no substantive explanation.

58.      Mrs. Ferrari said she was amenable to a compromise, but at that time her daughter was pregnant with Mrs. Ferrari's second grandchild, and she preferred to keep her schedule the same so she could maintain her babysitting commitment to her 3-year old grandson every Friday. The doctors accepted that response in that meeting.

59.      On information and belief, Kathy Kennady of JMA then met with Dr. Shah, Dr. Ramsay, and Dr. Le, to "discuss" Mrs. Ferrari's employment without her present.   Kennady

---

[2] Despite being on notice of Mrs. Ferrari's accumulating vacation hours for many months, Defendants only raised it with her in close temporal proximity to her protected activity, as alleged herein.  For example, as of December 2017 Mrs. Ferrari had 583.25 vacation hours and in 2014, she had 402.48 hours.  Prior to November 2018, Mrs. Ferrari's vacation time had never been put at issue in her 17 years of employment.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

contacted Mrs. Ferrari a few days later to say: "I want you to come by the office to talk in detail about what the doctors want to do."  When the two women met, Kennady told her the IMA doctors sought to change the conditions of her employment drastically – these changes included her schedule, pay, and benefits.  Kennady followed up via email on December 6, 2018, falsely stating Mrs. Ferrari had now "agreed" to new employment terms as set forth therein, to which Mrs. Ferrari had not in fact agreed.  Kennady's email purported to decrease her salary, award her less vacation time, and cut her annual sick time accrual in half.

60.    From there, the following communication occurred:

a. On December 6 via email, Kennady stated that IMA "recommends" paying out 395 hours of Mrs. Ferrari's vacation time; paying her and having her work 32 hours a week with no work on Fridays; decreasing her "salaried rate"; forcing her to take lunch breaks; prohibiting her from working overtime without permission and requiring that she punch in; setting her vacation and sick day accrual at 16 and 5 days per year respectively; and setting her schedule as Monday-Thursday "until 5pm." Kennady also told Mrs. Ferrari that if she works more hours, she will not be paid for that time.   Mrs. Ferrari and Kennady spoke in person about this arrangement, where Mrs. Ferrari asked questions about the impact of the proposed terms on her employment.

b. Kennady purportedly then reported back to the IMA doctors.

c. On December 12, Kennady wrote in an email that Mrs. Ferrari "agreed" to work: 35 hours per week with no change in pay but increased hours; vacation and sick accrual of 18 and 6 days respectively; and a new "expectation" that she work additional hours when "emergent situations arise."

d. Mrs. Ferrari, seeking clarity for what was already a dizzying round of communications, asked what "emergent" meant in this context.   Kennady responded on December 13 stating among other things: "I can't specifically define emergent."

e. After this pattern continued for another five days, Mrs. Ferrari met with all the doctors, and Kennady. As follow up, she asked the doctors to resolve her fate, saying "I've looked over all [the doctor's] requests of me, and have conceded to every one of them…[T]his whole situation has been extremely stressful to me . . ." Kennady responded, asking to meet with Mrs. Ferrari, and the doctors the following day.

f. Kennady wrote Mrs. Ferrari on December 19, 2019, stating: "The Practice has decided" to change Mrs. Ferrari's schedule to work additional hours for less pay, vacation time, and sick leave, and:

We will need your commitment and agreement regarding the above-mentioned items by signing and returning this letter to me no later than 5:00pm on Friday, December 21. If you choose not to continue your employment on these terms, which is your right of course, we will consider that you have resigned your employment with JMA assigned

to work at [IMA] effective at the close of business on December 31, 2018.

61.     Mrs. Ferrari, unrepresented by counsel, and confused by the threat of losing the job she had worked and loved for 17 years, was greatly distressed to receive this email.  Mrs. Ferrari was also physically ill at the time, for which she sought medical treatment.

62.     Mrs. Ferrari immediately emailed Defendants stating she was very ill, would regretfully need the next day off work, and asked for an extension on Defendants' response deadline, as she found great difficulty absorbing what was being asked of her in only two days.

63.     On December 20, 2019, JMA responded: "tomorrow's date will not be extended." Mrs. Ferrari forwarded her doctor's note attesting to her illness, which recommended she take four days off.  Kennady responded: "I received the letter from your doctor…the deadline to respond to the terms of the letter is still tomorrow."

64.     Mrs. Ferrari, overwhelmed at the thought of losing her job, contacted counsel for help.  On December 21, Mrs. Ferrari's attorney emailed Defendants asking for additional time to respond in light of the Christmas holidays and as a professional courtesy.  Kennady did not respond, but emailed Mrs. Ferrari directly that "we didn't hear from you and . . . took no response to be a decision that you did not accept the schedule.  Therefore, we are moving forward with pay[ing] you through the end of the year including all accrued unused vacation time."

65.     Ms. Ferrari's counsel emailed Kennady again the next day, explaining she did not wish to voluntarily resign.  In a letter dated January 3, 2019 sent directly to Mrs. Ferrari, Kennady stated: "This letter confirms you have not committed to the full-day, 4-day workweek as of this date, and you have therefore confirmed your resignation."

66.     The "final" terms imposed by JMA would have the cumulative effect of reducing Mrs. Ferrari's pay by $10,388.88 annually, deducting two weeks of vacation time per year, and requiring that she work additional hours than the schedule she had held for over a decade.

67.     And throughout these meetings and correspondence, Defendants made consistent, discriminatory comments about Mrs. Ferrari's age.  Mrs. Ferrari was undeniably in a lesser bargaining position throughout these conversations.

68.     But these proposed terms were nothing more than pretext: to rid themselves of Ms. Ferrari due to her age and whistleblowing conduct.  Defendants' rejection of Ms. Ferrari and her counsel's good faith requests for additional time is further evidence of the intimidating, adverse, and pretextual nature of the termination.

**F.     Mrs. Ferrari Engages In "Protected Activity" Under FEHA By Opposing Defendants' Age Discrimination**

69.     In the months leading up to her eventual termination, Mrs. Ferrari told IMA doctors and employees on several occasions that she was being unfairly targeted because of her age.

70.     For example, Mrs. Ferrari told Kennady, as IMA's Human Resources representative, that she felt targeted due to her age, since Defendants' proposed changes to her employment were directed only at her, IMA's oldest employee.  IMA's unwillingness to specifically explain its adverse changes, and the discriminatory comments made by Defendants as alleged herein, contributed to Mrs. Ferrari's embarrassment at being singled out for her age.

71.     Mrs. Ferrari shared, orally and in writing with Defendants that this series of events was enormously stressful for her.

72.     Kennady's response was decidedly one-sided: in her own words, her aim was for Mrs. Ferrari to either accept the doctors' imposed conditions or depart the Practice.  Kennady had no interest in appropriately handling Mrs. Ferrari's complaints, and Mrs. Ferrari's opposition to Defendants' discriminatory conduct substantially motivated their termination of her.

**G.     Direct and Circumstantial Evidence Show That Mrs. Ferrari's Termination Was Pretextual**

73.     Defendants vaguely cited "business" reasons for the changes to Mrs. Ferrari's employment, such as reducing expenses or requiring longer periods of front-desk coverage.  But both direct and circumstantial evidence demonstrate that this purported reason was mere pretext for an unlawful termination.

74.     For example, in August 2018, approximately four months before taking adverse employment action against Mrs. Ferrari, IMA created and funded two Supervisor desk positions,

giving them a $3.00 per hour raise, in apparent contradiction of Defendants' assertion that it sought to change Mrs. Ferrari's employment terms to cut costs.

75.     On information and belief, Defendants did not make adverse changes to any other employees' terms of employment.  Mrs. Ferrari was singled out and adversely impacted, despite 17 years of positive reinforcement.  Mrs. Ferrari never received any poor performance evaluations and had never been placed on a "Performance Improvement Plan" ("PIP").  And she appeared to have exceeded the performance expectations set for her.

76.     And many of Defendants' desired changes to Mrs. Ferrari's employment directly contradicted IMA's own employment policies. For example, IMA's Employment Handbook which purportedly governs all employees, states that after eleven years of service, an employee will accrue four weeks of paid vacation per year (20 days), while Defendants only sought to give Ms. Ferrari fifteen days.[3]

77.     Mrs. Ferrari's age, whistleblowing conduct, and protected activity under FEHA took place in extremely close temporal proximity to her termination.  She met with doctors to complain about their medical billing fraud within days and weeks of Defendants' adverse action against her.  Defendants' proposed changes to Mrs. Ferrari's employment also occurred with striking temporal proximity to both her husband Tom's retirement.

**H.     Conditions Precedent to Filing Action**

78.     Mrs. Ferrari has complied with all required conditions precedent prior to filing this action.

79.     Mrs. Ferrari has complied with any and all pre-lawsuit filing requirements, including, but not limited to, receiving a right to sue letter from the Department of Fair Housing and Employment ("DFEH") and the Equal Employment Opportunity Commission ("EEOC") for the claims covered herein.

//

//

---

[3] On information and belief, IMA's Employment Handbook was drafted, and the policies therein created, at JMA's recommendation and counsel.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

# V.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**(Unlawful Retaliation Under the Federal False Claims Act 31 U.S.C. § 3730(h)**
**(Against IMA, Dr. Beatty Ramsay, M.D., Dr. Timothy Offensend, M.D.,**
**Dr. Hema Shah, M.D., Dr. Hoa Le, M.D. and Dr. Anuradha Reddy, M.D.)**

80.    Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

81.    IMA is covered by this retaliatory discharge statute, 31 U.S.C. § 3730(h), because it seeks reimbursement from the government for providing services to patients covered by Medicare.

82.    Mrs. Ferrari made numerous reports to Defendants about their improper, and illegal billing practices, as explained herein.  Specifically, by way of example only, Mrs. Ferrari reported Defendants' billing for medically unnecessary services or for services not actually performed; and Defendants' failure to properly maintain its patients' files.

83.    As a cause of her reporting, investigating, complaining of, and attempting to stop the fraudulent conduct of IMA, Mrs. Ferrari was discharged by Defendant because of the lawful protected conduct and acts done in furtherance of an action under 31 U.S.C. § 3730(h).  Prior to her discharge, Defendants took adverse employment action against her and sought to adversely impact the terms and conditions of her employment.

84.    Mrs. Ferrari has suffered damages, including, but not limited to, loss of salary, commissions, annual merit increases, benefits, and other valuable employee benefits.

**SECOND CAUSE OF ACTION**
**(Unlawful Retaliation for Whistleblowing Under the**
**California False Claims Act, Gov. Code, § 12653)**
**(Against IMA, Dr. Beatty Ramsay, M.D., Dr. Timothy Offensend, M.D.,**
**Dr. Hema Shah, M.D., Dr. Hoa Le, M.D. and Dr. Anuradha Reddy, M.D.))**

85.    Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

86.    Defendants took adverse employment action against Plaintiff by dramatically changing the terms and conditions of her employment and ultimately terminating her because she

took actions to stop false claims by consistently reporting Defendants' practice of submitting false claims to Defendants' executive team of doctors.

87.     Mrs. Ferrari was an employee of IMA's within the meaning of the California False Claims Act statutes.  IMA accepted and treated patients receiving Medicare, Medi-Cal and other government-sponsored health plans and submitted claims for reimbursement to Medicare and Medi-Cal and other state or local agencies.

88.     Through Defendants' practice of billing Medicare, Medi-Cal, and other state or local agencies for medically unnecessary services; billing for services not actually performed; and Defendants' failure to properly maintain its patients' files, it has defrauded the federal government (Medicare false billing) and California (Medi-Cal) of money, property or services by submitting false and/or fraudulent claims to the government for payment or approval.

89.     Mrs. Ferrari consistently reported to other doctors what she believed to be fraudulently filed false claims.

90.     Mrs. Ferrari also retained legal counsel with the goal of stopping Defendants' illegal behavior.  When Defendants learned that she did so, they promptly terminated her.  Each of the foregoing acts taken by Mrs. Ferrari was in furtherance of stopping a false claim, and/or bringing a false claim action.

91.     Mrs. Ferrari had reasonable suspicions of a false claim, and it was reasonably possible for Mrs. Ferrari's conduct to lead to a false claims action.

92.     Defendants terminated Mrs. Ferrari.  Mrs. Ferrari's acts in furtherance of stopping a false claim, and/or bringing a false claim action were a substantial motivating reason for Defendants' decision to impose adverse employment action against her, and to terminate her.

93.     Mrs. Ferrari was harmed by Defendants' choice to terminate her.  She has suffered damages, including, but not limited to, loss of salary, annual merit increases, benefits, and other valuable employee benefits.

94.     Defendants' conduct was a substantial factor in causing Mrs. Ferrari's harm.

//

1

2

3

**THIRD CAUSE OF ACTION**
**(Unlawful Discrimination on the Basis of Age**
**in Violation of Cal. Gov. Code § 12940(a))**
**(Against All Defendants)**

4

5

95.     Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

6

7

8

96.     Cal. Gov. Code § 12940(a) makes it unlawful to discharge an employee on the basis of age.  At all relevant times, Defendants were Mrs. Ferrari's employers under California's Fair Employment and Housing Act ("FEHA").[4]

9

10

11

97.     Defendants tried to impose adverse changes to Ms. Ferrari's employment by setting retirement requirements, determining benefits or conditions of employment, and ultimately terminating her.

12

13

98.     Mrs. Ferrari was 59 at the time of her termination, and during the entire time of her employment with Defendants, she was over 40 years old.

14

15

16

99.     Mrs. Ferrari's age was a substantial motivating reason for Defendants' setting retirement requirements, determining benefits or conditions of employment, and ultimately terminating her.

17

18

19

100.    Mrs. Ferrari's imposition of adverse employment actions and ultimate termination caused her harm, and the Defendants' conduct was a substantial factor in causing harm to Mrs. Ferrari.

20

21

101.    On information and belief, no similar adverse employment actions were taken against any other employee of IMA's who were Mrs. Ferrari's age.

22

23

24

**FOURTH CAUSE OF ACTION**
**(Unlawful Retaliation for Engaging in Protected Activity**
**In Violation of Cal. Gov. Code § 12940(h))**
**(Against All Defendants)**

25

26

102.    Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

27

28

---

[4] JMA was Mrs. Ferrari's employer under FEHA from the time it was retained by IMA, in or about 2005, until her termination.

103.    Cal. Gov. Code § 12940(h) makes it unlawful for an employer to discharge or discriminate against any person who has complained or assisted in any proceeding or opposed "forbidden practices," of which age discrimination is one.

104.    Mrs. Ferrari complained several times to IMA and JMA about their discriminatory conduct against her, which was substantially motivated by her age.  For example, Mrs. Ferrari:

   a.   Told IMA doctors on several occasions in the months leading up to her eventual termination that she felt their conduct against her constituted age discrimination;

   b.   Reported concerns to Kennady, IMA's Human Resources representative, that she felt unfairly targeted due to her age, and as the eldest person on staff; and

   c.   Shared with Defendants orally and in writing, that she believed the series of communications from them targeting her employment conditions, were made discriminatory against her because of her age, and were causing her enormous stress and embarrassment as the eldest person on staff.

105.    Defendants discharged Mrs. Ferrari and took adverse employment action against her in retaliation for engaging in protected activity as alleged herein.

106.    Mrs. Ferrari's complaints were a substantial motivating reason for Defendants' decision to take adverse employment action against her, and ultimately terminate her.

107.    Mrs. Ferrari was harmed by Defendants' termination of her, and Defendants' decision to terminate her was a substantial factor in causing her harm.

**FIFTH CAUSE OF ACTION**
**(Unlawful Retaliation for Whistleblowing**
**In Violation of Cal. Lab. Code § 1102.5)**
**(Against All Defendants)**

108.    Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

109.    Cal. Lab. Code § 1102.5 makes it unlawful for an employer to retaliate against an employee for disclosing conduct that he reasonably believes is a violation of the law. At all relevant times, Defendants were Mrs. Ferrari's employers under Cal. Lab. Code § 1102.5(b).

110.    Defendants, and each of them, retaliated against Mrs. Ferrari for vehemently opposing what she reasonably believed to be violations of state and/or federal law.

111.    As alleged herein, Mrs. Ferrari reasonably believed that Defendants were engaged in unlawful practices by, among other things: fraud and accounting fraud against Medicare, Medi-Cal, and insurance providers.

112.    Mrs. Ferrari repeatedly told Defendants that she opposed the above-referenced conduct, refused to participate in it, and/or believed it to be unlawful, discriminatory, unethical and/or in violation of public policy. Shortly thereafter, in close temporal proximity to her whistleblowing conduct, Defendants terminated her.

113.    Mrs. Ferrari's opposition and whistleblowing regarding this conduct was a contributing factor in Defendants' decision to terminate her. Mrs. Ferrari's opposition and whistleblowing regarding the conduct described herein was a contributing factor in Defendants' decision not to take adverse employment action against her, by forcing her to accept adverse changes to the longstanding terms of her employment.  Defendants retaliated against Mrs. Ferrari for engaging in the foregoing conduct.

114.    The various adverse employment decisions by Defendants, including termination, caused Mrs. Ferrari harm and Defendants' conduct was a contributing factor in causing Mrs. Ferrari harm.

**SIXTH CAUSE OF ACTION**
**(Wrongful Termination in Violation of Public Policy)**
**(Against All Defendants)**

115.    Plaintiff incorporates herein by reference each and every allegation in this complaint as though fully set forth herein.

116.    At all relevant times, Defendants were Plaintiff's employers for the purposes of *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167 (1980).  Under Tameny, it is unlawful for an employer to discharge an employee for reasons that violate public policy.

117.    Defendants terminated Mrs. Ferrari because of her age, because she engaged in protected activity under FEHA, because she engaged in protected whistleblowing conduct and other protected activities as alleged herein, including making several reports in furtherance of stopping a false claim, or in furtherance of bringing a false claims action.

118.    Mrs. Ferrari's termination and other adverse employment actions as alleged herein caused him harm.

## PRAYER FOR RELIEF

WHEREFORE, Mrs. Ferrari prays for judgment against Defendants as follows:

1.    For monetary damages, and all other appropriate legal and equitable relief;

2.    General, special, and consequential damages sustained by Plaintiff according to proof;

3.    For back pay, front pay, compensatory damages, emotional distress damages, consequential damages, and double damages;

4.    Prejudgment interest at the maximum rate;

5.    Reasonable attorneys' fees and costs;

6.    Appropriate injunctive and declaratory relief;

7.    Costs of suit herein;

8.    Punitive damages; and

9.    For such further relief as the Court or finder of fact may deem just and proper.


Dated:  November 15, 2019              **COTCHETT, PITRE & McCARTHY, LLP**


By:   _/s/ Adam J. Zapala_
        ADAM J. ZAPALA
        TAMARAH P. PREVOST

        *Attorneys for Plaintiff*

**REQUEST FOR JURY TRIAL**

Plaintiff, JOANNE (NONI) FERRARI, hereby requests a jury trial.


Dated:  November 15, 2019                    **COTCHETT, PITRE & McCARTHY, LLP**


By:   */s/ Adam J. Zapala*
                ADAM J. ZAPALA
                TAMARAH P. PREVOST

                *Attorneys for Plaintiff*

COMPLAINT                                                                    22